**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America,   )<br>              )<br>        Plaintiff,   )<br>              )<br>vs.           )<br>              )<br>              )<br>Diana Kathleen Walker,   )<br>              )<br>        Defendant.   )<br>_____  ) | CR 08-1305-PHX-GMS<br><br>**ORDER** |

Defendant filed a Motion to Suppress evidence obtained as the result of an illegal detention in violation of the Fourth Amendment. (Dkt. # 9.) The United States responded thereto. (Dkt. # 11.) An evidentiary hearing occurred on January 7, 2009. After the hearing, Defendant requested and was permitted the opportunity to submit a supplement to her motion. (Dkt. # 17.) The United States responded to this supplemental briefing (Dkt. # 20) and the Defendant replied (Dkt. # 21).  After considering all of the evidence and the arguments, Defendant's Motions to Suppress are denied for the following reasons.

## BACKGROUND

In this case, a Scottsdale resident whose mail was being stolen provided the United States Postal Investigation Service with video footage taken on September 18, 2008, that demonstrated mail was being taken from the resident's mail box without authorization. The mail was taken from the box by a female driving a white Plymouth Breeze with a Texas

license plate. The female suspect appeared to be wearing pig tails and sunglasses. The videotape was reviewed at least ten times by Postal Inspector Greg Torbenson. He discerned the make and model of the vehicle and then the number on the Texas license plate. He was subsequently able to determine through a series of inquiries that the car belonged to a man who lived in a Budget Suites Motel in Phoenix with the Defendant. Personnel at the Budget Suites confirmed that a woman was living at the motel with the owner of the car, and when the Defendant's identification photograph was obtained, it was similar to the person in the surveillance photograph.

The United States Postal Investigation Service obtained the assistance of the Phoenix Police Department in setting up a surveillance operation on the Defendant on October 21, 2008. On that morning, Defendant walked for approximately two hours through residential neighborhoods close to the Budget Suites in which she was living. The officers conducting the surveillance believed that the Defendant appeared to be the same woman shown taking the mail in the Scottsdale surveillance photographs. During the course of her walk through the residential neighborhoods, the Defendant was out of sight of the officers on several occasions. Although the officers never observed the Defendant violating the law, the postal inspector observed her looking over her shoulders, apparently attempting to discern if she was being observed or followed.

At approximately 12:55 PM, the postal inspector instructed Phoenix uniformed police officers – Ashmore and Huskinson – to detain the Defendant until he could question her further. The Defendant was approached by the officers while she was using the pay phone outside a Circle K. The officers were in uniform and asked her to terminate her call and further informed her that detectives would like to speak with her. They informed the Defendant that she was not under arrest but did request permission to search her backpack. The Defendant declined to give such consent. While they waited for the postal inspectors to arrive, the Defendant requested a cigarette and one was provided for her. She was not handcuffed or placed in a patrol car, nor was she informed that she was free to leave.

Within five minutes from the time she was originally approached, Postal Inspectors Torbenson and White arrived on the scene. They were not in uniform. Nor was Officer Vasquez from the Phoenix Police Department, who arrived at the scene at approximately the same time. Torbenson again stated to the Defendant that she was not under arrest, but told her he suspected her of stealing mail and that she had stolen mail in her backpack. He showed her the surveillance photos of the woman whom she resembled stealing mail while driving the car belonging to the Defendant's boyfriend. He pointed out to her that like the woman in the surveillance stills she was wearing pigtails and the same style of sunglasses. The Defendant admitted driving a white Plymouth and she admitted living with the car's owner in the Budget suites.

After Torbenson had been speaking with the Defendant for approximately fifteen minutes, Phoenix Police Officer Vasquez initiated a break in the conversation between Torbenson and the Defendant. Vasquez indicated to Torbenson that the police had ascertained that the Defendant was on probation and that her probation officer had been called. While Vasquez was having this discussion with Torbenson, the Defendant admitted to Officers Huskinson and Ashmore and Inspector White that she possessed a meth pipe and stolen mail in her backpack and she verbally consented to a search of her backpack. She assisted the Phoenix police in locating the meth pipe. She subsequently again gave her consent to Inspector Torbenson to search her backpack for the stolen mail, which he did. At some point, Defendant's parole officer arrived on the scene.

Thereafter, at the request of Inspector White and Officer Vasquez the Defendant accompanied them to the motel in which she lived with her boyfriend, although she did not wish to be seen by her boyfriend in the officers' company. The officers then took the Defendant to a fast food restaurant, and then to a Costco parking lot, where the Defendant ate her fast food with the law enforcement personnel. Postal Inspector Miranda Garcia then arrived at this location. The Defendant was subsequently given Miranda warnings in the Costco parking lot, signed a waiver of rights, and gave a statement to the postal inspectors. She was then again informed that she would not be arrested, at least on that day. She was

1 taken to meet her father at a Jack in the Box parking lot. The Defendant thereafter left the
2 restaurant parking lot in the company of her father and was not taken into custody by the
3 inspectors.

## ANALYSIS

5 The Defendant's initial motion to suppress asserted that law enforcement personnel
6 did not have sufficient "reasonable suspicion" to undertake an investigatory stop of the
7 Defendant. The Defendant's post-hearing memorandum further asserts that at some point
8 during the stop, prior to the Defendant giving consent to the search of her backpack, the stop
9 became an arrest. Because the Defendant asserts the *de facto* arrest vitiated the consent she
10 gave to search her backpack, the government did not have sufficient probable cause to make
11 an arrest and the evidence subsequently taken by the government from the Defendant should
12 thus be suppressed. Neither argument is persuasive.

13 In cases of brief investigatory stops that fall short of traditional arrest, "the Fourth
14 Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe
15 that criminal activity 'may be afoot,'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002)
16 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In this case, the postal inspector's
17 decision to detain the Defendant for a "brief investigatory stop" was at least supported by
18 reasonable suspicion. A female who was driving a car with a Texas license plate was
19 photographed stealing mail from a Scottsdale residence. The ownership of the car with the
20 Texas license plate was traced to a man with whom Defendant was living. Defendant wore
21 pigtails and sunglasses that appeared to be similar to those in the video footage, and she also
22 resembled that person. Defendant went for a more than two hour walk in residential
23 neighborhoods close to where she was staying. Even though the surveillance teams never
24 observed Defendant violate the law, she looked over her shoulders in a manner suggesting
25 that she wanted to make sure that she was not being observed. Under the totality of these
26 circumstances, there were sufficient objective criteria for the postal inspector to form a
27 reasonable suspicion that criminal activity might be "afoot" to conduct a brief investigatory
28 stop. That the Defendant was not informed that she was free to leave during this brief

1 investigatory stop does not offend the Fourth Amendment. *See Arizona v. Johnson*, No. 07-
2 1122, slip op. at 9 (U.S. Jan. 26, 2009) (Defendant was not free to leave during a traffic stop
3 for a civil traffic violation, but such restriction did not violate the Fourth Amendment, nor
4 did it turn the exchange into a strictly voluntary one) (citing *Brendlin v. California*, 551 U.S.
5 249, 258 (2007)); *cf. Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) ("[J]ust as it would be
6 thoroughly impractical to impose on the normal consent search the detailed requirements of
7 an effective warning, so too would it be unrealistic to require police officers to always inform
8 detainees that they are free to go before a consent to search may be deemed voluntary.")
9 (internal citations and quotations omitted).

10 Of course, at some point, if continued without her acquiescence, a detention ceases
11 to qualify as a "brief investigatory stop" and becomes a *de facto* arrest for which probable
12 cause must exist. *See United States v. Chamberlin*, 644 F.2d 1262, 1267 (9th Cir. 1980).
13 While the Defendant never addresses the point at which she alleges the "brief investigatory
14 stop" became an arrest, she does assert that she was *de facto* arrested prior to the time that
15 she gave consent to the search of her backpack, thus tainting and vitiating that consent.

16 While there is no bright line of demarcation between an investigative stop and an
17 arrest, there are a number of factors courts consider in determining whether a detention
18 actually constitutes an arrest. In her brief, Defendant identifies a number of such factors
19 derived from *United States v. Perea*, 986 F.2d 633 (2d Cir. 1993). They include:

20 **(1)    The Duration of the Detention**

21 The testimony at the hearing suggests that once the Phoenix Police Officers informed
22 the Defendant that the postal inspectors wished to speak with her, it took those inspectors less
23 than five minutes to arrive on the scene. Thereafter, Inspector Torbenson began questioning
24 the Defendant. Approximately fifteen minutes after he began his discussion with the
25 Defendant he was interrupted by Officer Vasquez. It was during this interruption that the
26 Defendant changed her mind and consented to the search of her backpack by the remaining
27 officers. The evidence presented at the hearing suggests that this was a chronological series
28 of events taking no longer than fifteen to twenty minutes in total.

**(2)    The Degree of Fear and Humiliation that Police Conduct Engenders**

There was no evidence that suggests that the law enforcement officers engendered fear or humiliation in the Defendant at any time, including prior to the time she gave her consent to search her backpack. They did not handcuff her, place her in a squad car or otherwise intimidate her. There is no suggestion that they verbally mistreated or otherwise misled her. They provided her with a cigarette at her request. Defense counsel suggests that the knowledge that her probation officer may have been coming to the scene and may have had authority to search her backpack induced the Defendant to voluntarily permit the search of her backpack. Even if the possible search of her backpack by her probation officer may have led the Defendant to consent to the search, the Court cannot say, under the facts of this case, that such a motivation renders her consent invalid, or that it results in the Defendant being placed under *de facto* arrest. Defendant offers no cases suggesting that it does.

**(3)    Transporting a Suspect to Another Location or Isolating Her**

The officers did not transport the Defendant to another location prior to her giving consent to search the backpack. Although the officers contend that the Defendant was free to leave, they concede that they never told her so, nor was she left alone between the time that the officers approached her and the time she gave consent to the search of the backpack.

**(4)    Handcuffing the Suspect**

At no time was the Defendant handcuffed.

**(5)    The Extent To Which The Defendant Was Confined**

Defendant was told she was not under arrest, she was not handcuffed or placed in a vehicle, nor did she otherwise have her freedom of movement restrained.

1     **(6)**     **The Amount of Force Used by the Police**

2     There was no testimony that police used any force on the Defendant prior to her
3 consent to the search of her backpack.

4     **(7)**     **The Number of Agents Involved**

5     By the time the defendant gave her consent to the search of her backpack there were
6 five law enforcement personnel on the scene, and possibly her parole officer.

7     (**8**)     **Whether There was a Suspicion that the Defendant was Armed**

8     There was no testimony at the hearing that there was any reasonable suspicion that the
9 Defendant was armed or otherwise dangerous.

10     Considering the totality of the circumstances as they existed based on the evidence
11 presented at the hearing, the Court concludes that Defendant was not under *de facto* arrest
12 prior to the time that she consented to the search of her backpack. It further concludes that
13 her consent to search her backpack was voluntary and valid. While by the time the
14 Defendant consented to the search of her backpack there were five law enforcement officers
15 at the scene, the only message consistently communicated to the Defendant by these officers
16 was that she was not under arrest. Moreover, none of the other circumstances weighs in
17 favor of the Defendant's argument. The Defendant had not been placed in handcuffs, placed
18 in a vehicle, or otherwise had her movements restricted. She was provided with a cigarette
19 by the officers at her request. She was not misinformed or coerced by the officers. In fact,
20 she initially declined a request to search her backpack, and the officers recognized her right
21 to refuse that request. Thus, it is apparent, that Defendant was aware that she had the right
22 to refuse to assent to a search of her backpack and she knew how to exercise that right. *See,*
23 *e.g.*, *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

24     The Defendant's consent came within approximately fifteen minutes of her initial
25 questioning by Postal Inspectors, and approximately twenty minutes from the time she was
26 first contacted by Phoenix Police. Based on the totality of all the facts that are presented, the
27 officers had reasonable suspicion on which to stop the Defendant, and they did not exceed
28 the parameters of that investigatory detention prior to the time that Defendant gave her

1  consent for the search of her backpack.  Thus, Defendant was not under arrest at the time she
2  gave her consent to search her backpack, and that consent was valid.  Once her backpack was
3  searched, the postal inspectors had probable cause to arrest the Defendant, had they done so.
4  Nevertheless, the evidence suggests that the Defendant then voluntarily accompanied the
5  officers to the Budget Suites, the Costco parking lot, and to meet her father.

6  Even if the Court were to determine that at some point the officers did *de facto* arrest
7  the Defendant prior to the time that she consented to the search of her backpack, the postal
8  inspectors had sufficient probable cause to arrest the Defendant for the September 18th theft
9  of mail from a Scottsdale Residence.  Whether or not she was ultimately charged with that
10 theft would not invalidate a search incident thereto.  *See United States v. Bookhardt*, 277
11 F.3d 558, 565 (D.C. Cir. 2002) ("[E]ven if probable cause does not support arrest for the
12 offense charged by the arresting officer, an arrest (and search incident thereto) is nonetheless
13 valid if the same officer had probable cause to arrest the defendant for another offense.").

14 Having determined that the postal inspectors had at least sufficient reasonable
15 suspicion to justify a brief investigatory stop, that the stop had not matured into an arrest
16 prior to the time the Defendant consented to a search of her backpack, and that once
17 Defendant did so there was probable cause to arrest the Defendant, **IT IS THEREFORE**
18 **ORDERED**, that Defendant's Motion to Suppress (Dkt. # 9) and Supplemental Motion to
19 Suppress (Dkt. # 17) are **DENIED**.

20 DATED this 30th day of January, 2009.

_____
G. Murray Snow
United States District Judge